**Oscar V. CARTER, Sr., Petitioner-Appellant,**

v.

**Charles MONTGOMERY, Respondent-Appellee.**

No. 84–8351.

United States Court of Appeals, Eleventh Circuit.

Sept. 3, 1985.

Roy Paul, (court appointed), Savannah, Ga., for petitioner-appellant.

Mary Beth Westmoreland, Atlanta, Ga., for respondent-appellee.

Before JOHNSON and HATCHETT, Circuit Judges, and LYNNE *, District Judge.

JOHNSON, Circuit Judge:

## I. STATEMENT OF THE CASE

### A. The Facts

At approximately 1:38 a.m. on the morning of November 4, 1977, the Ware County Sheriff's Department received a call from Oscar Carter. Carter asked that a deputy sheriff be sent to his address because of a shooting there. The operator who received

* Honorable Seybourn H. Lynne, U.S. District Judge for the Northern District of Alabama, sitting by designation.

the call sent deputies and an ambulance to Carter's address. Upon their arrival at Carter's mobile home, the deputies found Carter and his teenage son sitting in the living room. Carter reportedly told them: "She's in the bedroom." In the bedroom, the deputies sheriff found the dead body of a woman, later identified as Diann Stevens, who had been shot in the head. After viewing the body, a deputy returned to the living room and read Carter his *Miranda* rights. Although Carter had not been questioned, two deputies stated that he later called out, "I'm a sorry son a bitch [sic], I killed her. Go ahead and put me in the car."

In the meantime, the deputies sheriff continued their investigation of the body. The dead woman held in her right hand a .357 magnum revolver, but the deputies observed that her grip on the gun looked unnatural. There were also fingerprints in the blood on the body's right wrist. When the gun was removed from the hand, the investigators saw that the hand had been shot through. One of them subsequently testified that it appeared that the entire body had been rearranged and posed on the bed after the shooting had taken place. Some blood and a bloody washcloth were also found in the bathroom sink.

Crime lab and medical experts determined that the woman had been shot at close range with the .357 magnum which was found in her hand. The bullet entered the back of her right hand, exited the palm and entered her skull at the corner of her right eye. The cause of death was the bullet wound to the head.

At trial, Carter presented an account of the shooting different than that reported by the deputies who had been called to the scene. He stated that he had taken up the pistol (which he kept in the house) when he and the victim had heard barking dogs outside and suspected prowlers. While he was checking the pistol to see if it was loaded, it had accidentally discharged, fatally wounding the victim, who was lying on the bed in Carter's bedroom. The victim's blood, according to Carter's account, had splattered Carter's son, who was also sitting on the bed, and he had gone to the bathroom to wash himself off. Carter testified that when he saw what he had done, he was frightened and placed the gun so that it was touching the victim's right hand. Carter stated, however, that he did not otherwise arrange the body on the bed. He testified that he had originally planned to let someone happen upon the body, but had later changed his mind and called the sheriff's office. Carter denied having stated to the sheriff's deputies that he killed the victim.

Carter's ex-wife and a first cousin of the shooting victim also testified for the defense at trial. Both witnesses testified that they saw Carter and the victim together the evening before the shooting. Both also stated that Carter and the victim had gotten along well on the night of November 3, 1977, and were planning to be married.

B. The Course of Proceedings

After trial by jury, Carter was found guilty of malice murder; he was subsequently sentenced, on February 3, 1978, by the Superior Court of Ware County, Georgia, to life imprisonment. The Supreme Court of Georgia affirmed both the conviction and the sentence. *Carter v. State*, 242 Ga. 695, 251 S.E.2d 285 (1978). Carter then filed a petition for a writ of habeas corpus in the Superior Court of Tattnall County. After a hearing held April 24, 1979, the court denied habeas relief. The Georgia Supreme Court subsequently denied Carter's application for a certificate of probable cause to appeal.

Noting that petitioner had exhausted his state remedies, the United States District Court for the Southern District of Georgia allowed Carter to file a federal habeas corpus petition, *pro se* and *in forma pauperis*, pursuant to an order dated August 14, 1981. Carter's federal petition raised four

grounds for relief: (1) denial of counsel in state habeas proceedings, (2) insufficient evidence to sustain conviction of murder, (3) ineffective assistance of counsel and (4) jury charge which improperly shifted burden of proof to defendant. The district court concluded that the record before it was sufficient for a proper examination of petitioner's claims and proceeded to consider the petition without holding an evidentiary hearing.

On April 5, 1984, the district court denied Carter's petition. Petitioner thereafter filed his Notice of Appeal and Motion for Certificate of Probable Cause to Appeal. On May 2, 1984, the district court granted the Motion for Certificate of Probable Cause to Appeal, and granted petitioner permission to appeal *in forma pauperis.*

## II. THE *SANDSTROM* CLAIM

### A. *Sandstrom* Error

■ Carter was tried on a charge of malice murder, of which intent is in all cases an essential element. With respect to the element of intent the court issued the following instruction:

> Every person is assumed to be of sound mind and discretion, but the presumption may be rebutted. The acts of a person of sound mind and discretion are presumed to be the product of the person's will. A person of sound mind and discretion is presumed to intent [sic] the natural and probable consequences of his act. But, these presumptions may be rebutted. Now a person will not [be] presumed to act with criminal intention, but the jury may find such intention upon consideration of the words, conduct, demeanor or motive and all other circumstances connected with the act for which the accused is being prosecuted. Now, I further charge you that a specify

[sic] intent to commit the crime charged in this indictment is an essential element that the State must prove beyond a reasonable doubt. Now, intent is always a question for the jury and is ordinarily ascertained by acts and conduct. Intent may be showed in many ways, provided that the jury finds that it existed from the evidence produced before them. It may be inferred from the proven circumstances, or by acts and conduct. Or it may be presumed when it is the natural and necessary consequence of the act in question.[1]

Petitioner argues that this instruction impermissibly shifted the burden of proof on the element of intent, in violation of *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), and its progeny. The instruction is virtually identical to the intent instruction given in *Francis v. Franklin,* —— U.S. ——, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985). In *Francis,* the Supreme Court considered the constitutionality of a jury charge in which the jury was instructed: "The acts of a person of sound mind and discretion are presumed to be the product of the person's will, but the presumption may be rebutted. A person of sound mind and discretion is presumed to intend the natural and probable consequences of his acts, but the presumption may be rebutted." *Id.* at —— U.S. ——, 105 S.Ct. at 1968. This instruction was preceded by instructions that the defendant was presumed innocent and that the State was required to prove every element of the offense beyond a reasonable doubt, and followed by an instruction that a person will not be presumed to act with criminal intention. *Id.* at ——, 105 S.Ct. at 1970.

The Court held that the jury charge taken as a whole violated the requirements of the Due Process Clause. The Court held that a reasonable juror might have inter-

---

**1.** The charge in the instant case also includes an instruction that "if a person uses a deadly weapon or instrumentality in the manner in which such weapon or instrumentality is ordinarily employed to produce death and thereby causes the death of a human being the law presumes the intent to kill," and states that this presumption, too, may be rebutted. This presumption would also appear to be governed by the principles applicable to the other presumptions.

preted the challenged intent instruction to create a mandatory rebuttable presumption which relieved the State of the burden of persuasion on one of the elements of the offense. *Id.* at ——, 105 S.Ct. at 1970. The fact that this instruction was apparently contradicted by prior and subsequent instructions did not cure the error. The Court said: "Language that merely contradicts and does not explain a constitutionally infirm instruction will not suffice to absolve the infirmity. A reviewing court has no way of knowing which of the two irreconcilable instructions the jurors applied in reaching their verdict." *Id.* at ——, 105 S.Ct. at 1975.

In *Davis v. Kemp,* 752 F.2d 1515 (11th Cir.1985) (en banc), this Court also held that a set of virtually identical instructions was unconstitutional. This Court held that where some portions of a jury charge improperly imposed upon the defendant the burden of disproving intent, other portions to the effect that the defendant was not presumed to act with criminal intent, and that the State had the burden of proving every essential element of a crime, were not sufficient to cure the error of the burden-shifting instruction. *See id.* at 1517–1519. Because we conclude that *Francis* and *Davis* are controlling in the present case, we hold that the jury instruction on intent was unconstitutional.

### B. Harmless Error

The court in *Davis v. Kemp, supra,* held that the harmless error doctrine may be applicable to a *Sandstrom* error, if the court can say "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." 752 F.2d at 1521 n. 7 (*quoting Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). The *Davis* court identified two circumstances under which a *Sandstrom* error could be harmless beyond a reasonable doubt: (1) where the instruction applied to an element of the crime not at issue at the trial or (2) where evidence of guilt was "overwhelming." 752 F.2d at 1521. In that case, the court found that the error perpetrated by the instruction was harmless, because the defendant, by offering an alibi rather than a *mens rea* defense, had taken intent out of issue.

The instant case, however, is easily distinguished from *Davis* in that the defendant here focused solely on a *mens rea* defense. Carter stated that he had taken up the weapon for purposes of protection, and that the gun had discharged by accident. In this respect the case bears far greater similarity to two other recent cases addressing the question of harmless error in the *Sandstrom* context: *Brooks v. Kemp,* 762 F.2d 1383 (11th Cir.1985) (en banc), and *Drake v. Kemp,* 762 F.2d 1449 (11th Cir.1985) (en banc). In these cases, this court held that a defense of accident or lack of intent not only places the element of intent in issue, but substantially reduces the extent to which evidence against the defendant can be considered to be "overwhelming." In *Brooks* virtually the only evidence offered in the suspect's defense was his own statement that the shooting had been an accident; yet the court held that this was sufficient to put intent in issue and prevent the evidence against the defendant from being considered "overwhelming." Accordingly, the court held that the *Sandstrom* error committed by the trial judge in instructing the jury on the issue of intent was not harmless.

The trial testimony here provides an even stronger case for rejection of the harmless error rule. Not only did Carter claim that the shooting had been an accident, and deny having made any statement to police about what he had done; but he provided an alternate explanation of why he had been handling the weapon at the time of the shooting. Moreover, other witnesses testified that Carter and the victim had planned to be married and were getting along well on the night of the shooting. Thus the testimony of at least three witnesses at trial supported Carter's inno-

cence, and rendered intent, the element concerning which the flawed instruction had been given, the central issue of the trial. Because neither of the circumstances identified by the *Davis* court as rendering error harmless was present in the instant case, we cannot say "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." The district court erred in denying the writ with respect to the malice murder conviction.

## III. SUFFICIENCY OF THE EVIDENCE

Carter argues next that the evidence presented at trial was not sufficient to convict him of malice murder. He points to his own claim of accident and the testimony that was offered by his former wife and first cousin as evidence that proof of malice beyond a reasonable doubt was lacking.

■ The question of whether the evidence was sufficient to convict Carter of murder must be answered in light of applicable Georgia law. *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S.Ct. 2781, 2791, 61 L.Ed.2d 560 (1978). The court must also view the record in the light most favorable to the prosecution. *Id.* In order to prove murder, the prosecution had to demonstrate the component of malice. While in some cases express malice is demonstrable, in many more malice must be proved indirectly by establishing facts from which it may be inferred by the jury. As the Georgia Supreme Court noted in *Patterson v. State*, 239 Ga. 409, 238 S.E.2d 2, 9 (1977), "[m]alice is a matter of intent, and the intent of a criminal accused is a matter peculiarly within his own knowledge ... [t]here is no way to prove it except by inferences from established facts."

■ There are two sets of facts in this case from which malice might be inferred. The first is the testimony of the two deputies sheriff that, shortly after the shooting Carter stated, "I killed her," without offering any claim of accident or further expla-

nation. This type of admission alone appears to be sufficient evidence, under Georgia law, from which to infer malice. *See Spencer v. State*, 231 Ga. 705, 203 S.E.2d 856 (1974); *Chandle v. State*, 230 Ga. 574, 198 S.E.2d 289 (1972). The *Spencer* case is particularly relevant here. In that case the court concluded that the jury was authorized to find malice rather than accident where the defendant had told the first police officers who arrived on the scene that he had killed his wife, and only later claimed that the weapon responsible for her death had discharged by accident.

The second set of facts which could give rise to an inference of malice is the placement of the murder weapon in the hand of the victim and the general rearrangement of the body on Carter's bed. Under Georgia law, "[e]vidence of acts and conduct at the scene of the commission of a crime and shortly thereafter is generally admissible, not only as the res gestae, but for the purpose of characterizing the quo animo with which the deed was perpetrated." *Price v. State*, 166 Ga. 120, 142 S.E. 666 (1928). While the defendant's conduct shortly after the shooting could be explained, as Carter himself suggested, by panic or fear over the consequences of an accident, it could also be explained by a desire to conceal the evidence of an intentionally committed murder.

The evidence of malice against Carter, as noted above, was not overwhelming. On the basis of such evidence a jury *might* have found that the defendant lacked the requisite element of intent. But it is "not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt," *United States v. Bell*, 678 F.2d 547, 549 (5th Cir.1982) (Unit B en banc), *aff'd*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983). It is simply necessary that, viewing all of the evidence in the light most favorable to the prosecution, a reasonable jury could have found that Carter possessed the requisite malice beyond a

reasonable doubt. On the basis of the evidence in the instant case, a reasonable jury could have so found.

## IV. DENIAL OF AN EVIDENTIARY HEARING

■■■ Petitioner next claims that the district court erred in denying him an evidentiary hearing. He argues that material facts were not developed at the state habeas hearing, largely because he had no counsel at this hearing, and that the district court's refusal to grant a new hearing violates the principles articulated in *Townsend v. Sain*, 372 U.S. 293, 313, 83 S.Ct. 745, 757, 9 L.Ed.2d 770 (1963). Two cases that have interpreted *Townsend* for this Circuit, *Norris v. Wainwright*, 588 F.2d 130 (5th Cir.), *cert. denied*, 444 U.S. 846, 100 S.Ct. 93, 62 L.Ed.2d 60 (1979), and *Thomas v. Zant*, 697 F.2d 977 (11th Cir.1983), will be helpful in assessing this claim. *Thomas* articulates the requirements that must be met in order to obtain an evidentiary hearing based on the claim that "the material facts were not adequately developed at the state court hearing": a petitioner must demonstrate (1) that a fact pertaining to his federal constitutional claim was not adequately developed at the state court hearing and that the fact was material (or "crucial to a fair, rounded development of the material facts") and (2) that the failure to develop that material fact was not attributable to petitioner's inexcusable neglect or deliberate bypass. *Thomas v. Zant, supra*, 697 F.2d at 986. *Norris* considers the standard applicable to a petitioner's claim that he should have been granted an evidentiary hearing at the federal level because he had no attorney in the state proceeding. The court concludes that there is neither an absolute right to an attorney at a state habeas proceeding nor a *per se* rule that lack of counsel at a state proceeding requires an evidentiary hearing at the federal level. 588 F.2d at 133. The test that

federal courts must apply to determine whether an evidentiary hearing is necessary is whether the lack of counsel at the state hearing resulted in a lack of fundamental fairness. *Id.*

■■■ According to these standards, the district court did not err in declining to grant an evidentiary hearing to petitioner. Petitioner does not explain which facts were not developed at the state hearing, nor does he make any attempt to demonstrate their materiality.[2] He does not even address the question of inexcusable neglect or deliberate bypass. As to petitioner's lack of counsel, he presents no specific facts from which one could conclude that his state hearing lacked fundamental fairness. Moreover, the state notes that at the state hearing petitioner was permitted to testify, offer evidence on his own behalf, and cross-examine the state's witnesses (including the attorney whose effective assistance was being questioned). The same circumstances were found sufficient to render a state hearing "fair ... in every respect" in *Williams v. Smith*, 434 F.2d 592, 594 (5th Cir.1970). Petitioner provides no ground for reversing this judgment of the district court.

## V. INEFFECTIVE ASSISTANCE OF COUNSEL

■■■ Finally petitioner argues that the district court erred in denying his claim of ineffective assistance of counsel at the original trial. Ineffective assistance claims must be assessed in light of the standard articulated in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Under this standard, petitioner must demonstrate first that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.*, ——, 104 S.Ct. at 2064, 80 L.Ed.2d at 692–93. In addition petitioner must demonstrate that such er-

---

**2.** Petitioner refers briefly to a few facts which were inadequately "discuss[ed]" by the state court, but this reference appears to be to the state court's order rather than to its development of the facts at the hearing.

ror resulted in prejudice, that "there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different." *Id.* ——, 104 S.Ct. at 2068, 80 L.Ed.2d at 698.

■ First, petitioner claims that his counsel refused to interview and subpoena certain witnesses. Not only was this claim denied by the attorney who testified at the state court hearing, but the record demonstrates that one of the witnesses in question actually testified at trial. Petitioner also claims that his attorney failed to object to the burden-shifting jury charge. Even if true, this single failure does not constitute error "so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." There appears to be no basis for concluding that petitioner was denied the effective assistance of counsel.

The judgment of the district court denying the writ on the basis of the *Sandstrom* issue is REVERSED and the case is REMANDED to the district court.